Good morning, Your Honor. I'm Maxwell Bleasher for the Appalachian Aviation Upgrade Technologies. This is a case where it's appropriate to start off by telling you about the boy that killed his parents and then cried he was an orphan. Here the defendants, understanding that the acquisition of an engine contract was the keystone and conditioned precedent of this plan to go forward to re-engine 727s, succumbed to the pressure of Boeing. Now they turn around and tell us that the plaintiff could not get financing and was otherwise unprepared to enter the market. We think the decision below is flawed for two reasons. First, under the established precedence of this Court, first in Sollinger in 1976, again in Chelson in 1983, and in June of this year in the Borns case, the question of intent and preparedness is, quote, factual in nature, quote, seldom presents a situation appropriate for a determination by summary judgment. And both in Sollinger and Chelson, a summary judgment entered for defendants was reversed because the Court found justiciable controversy. The Court of Appeals of the District of Columbia in the Newman case said the proper way to handle intent and preparedness questions is to defer them for trial. And the ABA has a jury instruction, F21, which says that intent and preparedness is a jury question and it gives the factors the jury is to consider in determining that issue. So at the outset, we suggest to you that the singular most important flaw and the basis for disposition quickly is that the justiciable controversy as to intent and preparedness presented by the extensive fact record below required resolution by the jury and not by the judge. And the standing cases that the defendants cite to under associated general contractors do invoke questions which are seldom factual in nature. The remoteness of the plaintiff from the thing, whether there's someone better and closer to bring the action, whether there's antitrust, injury, those kinds of things can most often be determined without a trial, but this one cannot. Ginsburg. Counsel, are you citing the Burns case for the proposition that standing is a factual issue? I thought you said that the case reversed a finding on that. No, ma'am. I meant, if I said that, I misspoke. The Sollinger case in 1976 and Chelson in 1983 were both cases in which this Court made the statement that intent and preparedness are factual issues seldom capable of resolution by summary judgment. In Burns, Judge Moreno sent the issue to the jury, and this Court, only a few months ago, the two-to-one decision, found that the submission to the jury was appropriate and recognized and applied the jury's finding on intent and preparedness. And I cite it to you only for the proposition that just a few months ago, this Court again recognized that the intent and preparedness question intensely factual in nature is a jury question that goes, as it did in the Burns case, to the jury with an instruction. I thought the district court also found as a matter of law that there was no standing. For a period, yes. In May, up through May of 1994, the district court found no evidence to create a justiciable controversy, and then for the period after that, it found conflicting evidence and gave it to the jury with a special interrogatory. So would you agree that in appropriate circumstances, a matter of law, there can be a lack of standing as a matter of law? Yes, I do. And just whenever there can be a summary judgment, because there's absolutely no justiciable controversy created by the record, in those cases, summary judgment is appropriate. This case bristles with fact issues that require adjudication, in my view, by jury. On the standing issue? Yes, on the intent and preparedness question. Now, but let me suggest to you that even if for some reason you change all the precedent of the court and the court of appeals of the district combine, you ignore the ABA, which says this is a jury issue and cites decisions of the Second and Sixth Circuit, as I recall, and maybe the Fifth and Sixth Circuit, if you ignore all that and you just look at the fact record in this case, I submit to you that you will find the wrong conclusion and you have de novo review. First, we have to ask ourselves, what is it that we're looking for? And what we're looking for here, as Sollinger observes, is to determine whether the plaintiff in this antitrust setting is a serious potential competitor. And how does he tell anybody he's a serious potential competitor? He has to take, quote, substantial demonstrable steps. Substantial demonstrable steps are the key words. The jury instructions, even weaker than that, take some steps. But let's assume the harder standard, substantial demonstrable steps to enter the market. He doesn't have to be an entry in the market, because if he's in the market, then he's an actual competitor and not a potential competitor. So this whole doctrine assumes that the plaintiff is not yet a full-fledged competitor, but he's trying to get there. The counsel, at a minimum, wouldn't want to expect a serious contender to have an office outside his home? You would if you're in an ordinary case, but what's unique about this, and that's just where I'm getting to, so I'm glad you're prompting me. What's unique about this case is distinguished from all the intent and preparedness cases you can find, is that this plaintiff and the two engine manufacturer defendants independently negotiated a sequence under which things would happen. And when they negotiated, when CFMI, General Electric, negotiated with the plaintiff, it knew and understood that he did not have any individual experience making aircraft and that he did not have employees in facilities and that he did not have financing and that he did not have a sale, and they set out a sequence. And did not have an office outside his home? He did not. They knew that? We contend they do. They contend they learned that later, but that's one of the factual controversies. But let me point out to you that on May 4, 1999, there's two documents here that blow them away, and this is in the record at Exhibit 320. This is CFMI's proposal to the plaintiff to sell them engines and sell them engines on an exclusive basis for six months, and it sets out on page one the sequence of events.  Then on June 30, 1999, 60 days later or 56 days later, you come in and show us that you have secured financing. Then in September, the end of September 1999, a full 120 days later, come in and show us that you have an order to buy one of the planes. That's the sequence that the parties set because they knew and understood here, unlike becoming a simple distributor of a record company, they knew and understood here that the condition preceding the entering the business on a full-fledged basis was the engine contract. It was the engine contract that set in motion getting the money, and getting the money would have let the plaintiff do all the other things it had to do. So was that a proposal? Yes, it was a proposal. It says, proposal update, I am pleased to advise you that CMFI agrees to your request to work with so and so forth. And this is what they set out as a proposal. And it's not binding at that point, right? That's kind of the parties are talking. With due respect, Your Honor, whether it is or is not binding is not my point. My point is CFMI and Rolls-Royce the same recognized that they needed to do the engine contract first. That was the prerequisite to going out to getting financing. Financing would have enabled them to make a lease for a facility, hire the employees, open up an office, and get started. How does that resolve the standing issue, in your view? It resolves it because the jury could find that had they not interfered with getting the engine contracts, which is the essence of our case, and Judge Prankerson makes a finding, goes out of his way here to make a finding saying there's evidence that both CFMI and Rolls-Royce succumbed to the pressure of Boeing and stopped the negotiations with these plaintiffs when they were pretty far along. He finds evidence of a conspiracy. So the question is, did that conspiracy prevent, prevent the plaintiffs from entering the business? That's what the ABA jury in said. To recover damages, the ABA says, it is not necessary that the plaintiff actually have entered into this business if you find that the defendant's alleged antitrust violation prevented plaintiffs from entering the business. That's our case. If the plaintiff is really able to enter the business or has to decide. That's what the jury has to decide. And here you agreed in some circumstances it can be decided as a matter of law. Yes, but not here because here they're making an offer to sell them. Let me tell you the rest of the story, as Paul Harvey would say. At the same time, my guy was negotiating with General Electric, CFMI. Along comes a joint venture called ITG. Now, ITG consists of three of the largest companies on the planet. Daewoo was going to make the planes. Lockheed was going to design them. And Citicorp was going to finance them. And they went to the ITG and they said, we want to do the same thing that Mr. Lundquist wants to do. We, and no one doubts their capacity to have done it. We want to do that. And we want exclusivity. And after mulling it over, lo and behold, what did CFMI decide to do? Decided to give my guy exclusivity and turn down that joint venture with three of the largest people on the planet. What does that tell you? What does that tell you? It tells you that CFMI made a determination at that point in time that this man was capable of bringing this plan to fruition. Otherwise, they would have tossed him out the door and dealt with the joint venture. But it gets better. Because after they turn him down, if you look at exhibit record page three to nine, this is an evaluation that they make at the conclusion. And this is what a responsible official of CFMI reports to his superiors. We believe that many, many as the plaintiff, will proceed with the project. If we decline, as he has invested personal time, 1.5 years, and money, $200,000 to $300,000 so far, and he has taken major steps in that direction, major steps, the same words, practically, that this Court used in Sollinger and Chelsen, substantial, demonstrable steps. Here's the defendant admitting that he has standing under the Chelsen. And we're sure you can. Kennedy. You're considerably over time already. Can you? I'll sum up, Your Honor. Let me make two more observations. The conspiracy itself. All within one minute. Excuse me? All within one minute? Yes. Yes.  The conspiracy itself is evidence that they thought he could do it. Why would you conspire to kill a corpse? And finally, the plaintiff was engaged in extensive negotiations. The record shows he went to at least five countries to look for facilities and inspected ten. He had a promise of financing, an oral promise from Burnham Securities, and an offer of a letter of credit from Scott Sperling. And then courts of appeals have said that's all that's necessary under the financing. And in excluding evidence, it's sort of like catching your own tail. First, Judge Pragerson excluded volumes of evidence. He excluded our expert. He excluded testimony at a plaintiff about his financing. He excluded testimony at a plaintiff about 14 employees he had lined up. He let in some of it, but he excluded it. So, of course, after he excludes all this evidence, he says there is no evidence. But I submit to you with due respect, because we all have the highest regards of Judge Pragerson, I submit to you that he erred under the Reyes-Jeskei doctrine in holding that this was hearsay. This is not hearsay. These statements were made to prove what the man was doing, that he took demonstrable steps. They're not offered to prove the truth. They're offered to prove what he did and, therefore, don't qualify as hearsay. I submit to you this should be sent back for resolution by a jury. Thank you, counsel. Good morning, Your Honors. And may it please the Court. I'm Chris Dussault from Gibson-Dunning Crutcher on behalf of CFMI. I would like to use two-thirds of the FOE's time today to speak on behalf of both of the engine companies, and then the remaining one-third of the time would be used by Boeing to address the issues from Boeing. Well, if you need it, we should give you, in fairness, 15 minutes to your side. Thank you, Your Honor. But I would use half of it. But that doesn't mean you should take it unless you need it. Okay. Thank you very much, Your Honor. Your Honors, this case presents a very straightforward issue. Did AUT have standing to sue under Section 4 of the Clayton Act for the alleged antitrust violations? Section 4 of the Clayton Act allows private plaintiffs to sue for the extraordinary damages in a very limited set of circumstances. That entity must be either an existing competitor or, in the case of a nascent firm such as AUT, it must demonstrate that it had both the intention and the preparedness to enter the industry. And what is absolutely clear in this case, Your Honors, from the undisputed facts, is that AUT lacked the preparedness to enter the industry. Mr. Breecher candidly admitted that, in fact, this issue can be resolved as a matter of law in an appropriate case. And I would submit that this is the quintessential case for such a determination. What the undisputed admitted facts showed was that AUT had no experience whatsoever in aviation or reengineering business. It had no access to the large sum of $90 million that it estimated itself it would need. It had no employees other than its founders. It had no offices other than a 400-foot square bedroom in Mr. Lundquist's house. It had none of the equipment, none of the facilities necessary for the massive task of reengineering aircraft. It had no customers. It had no orders. It was not prepared. And under the established precedent of this circuit, from Sollinger on over nearly a quarter century, such an entity lacks the standing to sue for trouble damages. That is the issue in this case. And Judge Preterson correctly held, based on that undisputed record of evidence, that AUT lacked standing. Now, I'd like to take just a moment, Your Honors, and look at each of the Sollinger factors very quickly. But I'd like to ask if the one of the companies or both companies gave proposals to this plaintiff knowing all of that and agreed to proceed in a particular manner, assuming they knew all of the factors you just mentioned, wouldn't that at least raise an issue as to whether they were met the test or raised a factual question? Well, Your Honors, first of all, we don't believe that the evidence shows that. But to address your question, if it did, the answer is that, no, it would not raise a disputed issue of fact because the undisputed objective facts show AUT's lack of preparation. One of the purposes of the standing requirement, Your Honors, is to distinguish the dreamer, the promoter, the great talker from the real deal. And if what the court is to say that the plaintiff can create his own standing by talking a good game and getting people excited about it and getting them to sign on, then you're standing a problem. Thomas Edison goes to General Electric and says they've got a great idea for another light bulb. And they say last time you were a failure. But, you know, we think we appreciate your brilliance, your imagination. We know you don't have anything. But we have confidence in you. And here's what we'd like to do. And we'll see, step by step, that you're good enough for us. Wouldn't that raise a factual question? Your Honor, it wouldn't because the issues are different and distinct. What this Court has held is that to have standing to sue for treble damages, you must be prepared at the time of the antitrust violation to enter the industry if you haven't entered it already. And that's the Bubar case. States that expressly. A business may decide that it's willing to do business with someone, even if there's, you know, an X percent chance that they'll achieve things down the road, maybe a Y percent chance that they won't. They have a right to make that decision. But when the question is whether a plaintiff can sue for treble damages, the clear precedent of this Court requires that if you're not in the business, you be prepared to enter the business. And the fact that entities or some of these firms may have talked to this new entrant, to this nascent firm, which, of course, is pro-competitive conduct that you would want to encourage them to do, doesn't mean that they are signing on to the fact that this entity is somehow prepared. I want to address the issue that AUT raises, that somehow the Sollinger factors are not applicable to this case and ought to be overlooked. I would submit that in this case, those factors are, in fact, extraordinarily applicable, and particularly the experience and financing factors. What you have to bear in mind is that this is reengineering airplanes. This is taking three engines off of aircraft, replacing them with two larger airplanes. It involves all of the engineering and technical tasks that go along with that. It is an extremely technical process. And to say that measuring a nascent firm's experience is not applicable in this case, I think, returns standing on its head. It is an extraordinarily important factor in this case. The second factor, and I think this is the factor that Judge Craigerson focused on most specifically, is financing. I would submit, Your Honors, that you have to search the standing cases far and wide to find a case where a nascent firm acknowledges that it needed $90 million to do its project. And if you look at the undisputed evidentiary record in this case, there is no admissible evidence that any of this $90 million was, in fact, available to AUT. Now, AUT essentially takes the position that since their business plan is let's get the engines first and everything else will fall into place, that ought to be taken on faith. That is not what the cases say. AUT knew that it was facing a summary judgment motion. It could have come forward with affidavits from financing sources who said either, yes, I'm making financing available, or I've come to an internal determination at my firm that if an engine company is in place with an engine contract, then I will provide financing. It could have made that determination, made that evidentiary showing. But interestingly, it didn't. And interestingly, what it chose to do was have the promoter, the person who the standing requirement is trying to determine, is he a big talker or is he the real deal, they want that person to submit an affidavit to the court saying, lots of people were willing to give me money and lots of people were willing to come work for me. The Court properly excluded that evidence. I would submit also, Your Honor, that the affirmative actions and consummation of contracts factors also under established precedent are not met in this case, particularly would direct the attention of the Court to the GoVideo case where the Court found a lack of standing where the plaintiff had, quote, no contracts to manufacture, sell, or otherwise participate in the market. The undisputed facts of this case show that to be the case here. So, Your Honor, I would submit that Judge Pragerson did not err in ruling that AUT lacks standing. This Court should affirm on that basis. We have stated in our briefs several alternative grounds that this Court may affirm on if it disagrees. Kennedy. Could you answer just one question? Because the – were there any of the factors relating to this individual's lack of financing, lack of experience, lack of staff that were not known to the companies at the time they negotiated these preliminary agreements? Absolutely, Your Honor. I mean, our access, the record shows there were two in-person meetings, certainly between my client CFM and AUT. The information that we had is the information that Minnie Lundquist provided to us. For example, Judge Rawlinson asked whether the defendants knew that the only office that he had was a bedroom in his house. There's no evidence in the record at all that CFM knew that before going to California to the meeting. There's none. There is evidence that's discussed in the record where, although AUT says it was always clear about its lack of preparedness, there are several mysterious letters and other representations that talk about you'll get to meet our employees, you'll get to see our customers. But I would submit, Your Honor, that while we believe that those aren't even disputed issues of fact, you don't have to resolve that here because the standing issue turns on the objective fact, on evidence based on the full benefit of discovery, not relying on what the promoter says, but relying on what the promoter really had. That is how you make the standing determination under 25 years of precedent from this Court, and based on those undisputed objective facts, there was no standing in the statute. Thank you, Counsel. Counsel, are you taking the remainder of the time? Yes, Your Honor. My name is Tom Bader, and I'm with the Perkins Cooley Law Firm and represent the Boeing Company. All right. Well, you'll have five minutes. Yes. From the Boeing perspective, I think it's useful to look at the other side of the coin in terms of looking at preparedness to enter the industry, which is the critical question under the Solinger test in the Ninth Circuit, and that is what are the economic realities of the commercial airplane manufacturing business and reengineering business? And that industry context, I think, establishes that it was highly improbable and therefore very much appropriate to dismiss this case on summary judgment for lack of standing. The proposal by Mr. Lundquist was a fairly dramatic redesign of a 30-year-old airplane, 727-200 airplane. It was to turn the airplane from a three-engine aircraft into a two-engine aircraft, which had anti-use engines, two of which were heavier and much more powerful than the three engines that were being replaced. It would require creation of new nacelles, design of new nacelles. That is the structure that surrounds the engine and attaches it to the aircraft. It would require a new auxiliary power unit, and it would ultimately require FAA certification in order for all of this to even be allowed to go to the market. The estimate by Mr. Lundquist was that it would need $90 million in order to accomplish this. There's undisputed testimony in the record to the effect that just the redesign of the nacelles alone would cost $120 million. And so this idea that somehow all that was needed was an engine contract to assure preparedness to enter this industry just does not square with the complexity of this, the complexity of the task here. This also goes to two additional grounds, independent grounds, for the summary judgment order by Judge Pragerson. That is that there was no harm to competition and that there is no way to prove damages here other than by pure speculation. No harm to competition because the undisputed facts in the record establish that there were alternatives, competitive alternatives to this $24 million device or re-engine, redesign project that Mr. Lundquist had in mind. There were hush kits. One of the reasons for this whole process was that there were new, stricter noise requirements called the Stage 3 noise requirements. But there were other ways to satisfy that that were much less expensive to the aircraft operators, $3 million for a hush kit. And as a matter of fact, American Airlines and FedEx, the largest owners of the largest fleets of the 727-200 aircraft, ultimately chose to go that route. Most importantly, the typical way to minimize the risk, although not eliminate it in this industry, is to get lead customers who will step up and say, we will commit and therefore you have a launch customer, which is how it's referred to in the industry. No single customer stepped up to the plate for Mr. Lundquist. Not only that, with respect to all of the aspects that were required to even have a hope or a chance of developing this new proposed redesigned aircraft, there were no contracts with anyone. There were no contracts with the people who would have to accomplish all of this work. And of course, Mr. Lundquist had no experience whatever. So as a consequence, even if one were to pass the standing issue, which I agree entirely with what Council for CFMI has said in that regard, there still is the question of what harm would there be to competition? As a matter of fact, airlines to solve these problems were in fact buying hush kits, which cost $3 million rather than $24 million. In addition, the record is undisputed that there was a much less expensive modification, a re-engine project, which rather than taking the brand new or taking the old engines off, the three at the rear of the aft section of the 727, simply replaced the original engines with updated Pratt & Whitney engines of the same type, but improved performance, leaving the older engine in the center position of the three positions at the rear of the aircraft. So what harm is there to competition? And it's fundamental, of course, in an antitrust case that harm to competition must be shown. And lastly, speculation as to damages. In order for Mr. Lundquist to have any hope of approving damages in the case, he would have had to have gone through many gates other than simply a contract to buy engines. The design stage, the retaining people who could achieve this sort of a dramatic redesign, FAA certification and customers, none of which was ever accomplished. And so as a matter of closing here, unless the panel has any questions, I would simply say that there is abundant support for the summary judgment decision, not only with respect to standing, but with respect to the other essential elements, gates which were not met by Mr. Lundquist. There was no harm of competition that has been shown, and damages are highly, highly speculative. Thank you, counsel. Mr. Bleacher. It is simply not correct that there is not a factual dispute about what CFMI knew while they were negotiating. At page 11 of our brief, we say to you flatly that they did know that he had at the time of the negotiations that the plaintiff had not yet hired employees, obtained order or obtained financing, and we cite to you a numerous number of record references. But the key error, aside from the fact that this whole collocation should be presented to a jury, the key error is you can't treat this case like an ordinary case because here the parties set the priorities. In 320 in the record, the proposal of May 4th, it was understood that first you get the contract, then you go and get the money 60 days later, then you do all the things they're complaining about. But they killed the infant in the crib, and now they say, gee, I'm an orphan. That's what I said at the beginning. They killed his parent. I don't like that metaphoric word. Okay. But that's what they did here. They stopped the engine. They stopped the engine contract from happening, and now they turn around and say to you, he didn't have a financing. He didn't have employees. He didn't have an office and so forth. Well, of course he didn't, but they knew all that, and they knew that would come after he got the contract, which led to the financing. And Rolls-Royce acknowledged the same thing. That's in the record at 584. So the sequence here is what makes this case unique, the fact that these parties agreed on a sequence in which the things they're complaining about would happen, and they cut off the plaintiff at the pass by saying to them, you can't get these engines, therefore we block the financing, and therefore none of these other things happen. That's exactly what this whole intent and preparedness question is about. And I submit to you that if you were to affirm this, you give industry a green light to go out and kill people at a very early stage and get away with it. This is a case that cries for resolution by a fact finder on a fully developed record. Thank you. Thank you, counsel. The case just argued will be submitted. The Court will take a short recess before the final argument of the day.
judges: Reinhardt, Fernandez, Rawlinson